GEORGE HERMANN, Appellant, *v.* KATE LUDWIG and Others, Respondents, Impleaded with JOHN C. GOETZ, Defendant.

Second Department, February 7, 1919.

**Will — joint will made by husband and wife — execution of second will inconsistent with joint will — former will not admitted to probate — resulting trust in favor of beneficiary under joint will — will consisting of single instrument signed by both parties — agreement evidenced by will itself — equity — when joint will is irrevocable — fraud — evidence — testimony of beneficiary under second will.**

Although a husband and wife had made a joint will giving to the survivor all property owned by either of them jointly or severally, where the wife subsequently made another will making other disposition of her property the joint will should not be admitted to probate on the death of the wife even though it was the result of a contract between her and her husband.

The relief to which the surviving husband is entitled is not by establishing the joint will as the last will of his wife, because it was not her last will, but by compelling the performance of her obligations by her children and devisees under her second will which should be admitted to probate, the wife's representatives being trustees of a resulting trust for the benefit of the surviving husband.

Where parties, pursuant to an agreement, make a joint will founded upon a sufficient consideration, each leaving property to the other, the will made in pursuance of such contract is irrevocable where, if the contract be abandoned, the other party cannot be restored to his former position, and a refusal to complete the agreement is in the nature of a fraud.

The joint will signed by both parties differs from a mutual will which may be executed by either party without the knowledge of the other, which latter does not necessarily import any mutual or reciprocal agreement. Where both parties executed their wills by the same instrument it is not possible that the course could have been adopted without some previous understanding or agreement between them.

A joint will executed by a husband and wife as a single instrument providing that " We give unto the survivor of us all and any real and personal property either owned by us jointly or severally for his or her own use and benefit forever," shows on its face that it was the result of an agreement founded upon a valuable consideration and differs from mutual or identical wills which exhibit no intrinsic evidence that they were made in consequence of an agreement between the parties.

It is not essential to the intervention of equity in order to prevent the accomplishment of fraud that an agreement should be established by direct evidence.

Where it appears that the children of the wife by a former marriage secretly. induced her to make a new will contrary to the terms of the former joint will, the fact that upon her death bed she admitted in the presence of her husband that she had made the second will was not notice of the revocation of the former will to which her husband was entitled.

A son of the wife by the former marriage who was a beneficiary under the second will was not competent to testify as to the death bed statements of his mother although her husband was present.

*Held,* that a finding that there was no evidence of an agreement or contract between the husband and wife as a basis for the former joint will is contrary to the evidence and contrary to law, and that judgment should be directed for the plaintiff establishing the former will as binding upon the beneficiaries under the second will and that they should be enjoined from asserting title to or interfering with the plaintiff's possession of his wife's property.

APPEAL by the plaintiff, George Hermann, from a judgment of the Supreme Court in favor of the respondents, entered in the office of the clerk of the county of Queens on the 20th day of August, 1918, dismissing the complaint on the merits upon the decision of the court after a trial at the Queens County Special Term.

The plaintiff brought this action in equity to establish a joint will executed on September 30, 1895, by himself and one Mary Hermann, deceased, praying for a decree that the provisions of such joint will are binding upon the estate of the deceased and upon the defendants in the action. The plaintiff asked for additional relief, viz., that the provisions of the joint will be carried out as the last will and testament of deceased, and that a later will executed by Mary Hermann on July 10, 1914, be declared inoperative, illegal, ineffectual, and null and void; that a decree of the Surrogate's Court of Queens county admitting the later will to probate be vacated and the letters testamentary issued thereunder revoked, and that the executor appointed in said will, and the defendant receiver, appointed in a partition suit between the parties in New York county, be directed to account to plaintiff. Plaintiff also prayed for an injunction restraining the defendants from interfering with the estate of said decedent, from prosecuting the action in partition, and for such other relief as might seem just and equitable.

The dispute between the parties was before this court in

May, 1917, upon an appeal by the defendants from a decree of the Surrogate's Court of Queens county, revoking the probate of the later will and admitting the joint will to probate. It was held that the Surrogate's Court had no jurisdiction to pass upon the equitable rights of the plaintiff, so as to deny probate to the later will, and that it was his duty to admit to probate the will of a decedent last executed in point of time, if the testator was competent to make it and it was executed in conformity with the requirements of the statute. This court said that it was not within the power of the surrogate to pass upon the question whether deceased had the right to execute such will because of a previous agreement to the contrary, and that if such an agreement existed, that fact and its legal results could only be determined by the Supreme Court in an action in equity, and the manner of determination was not to admit a former will to probate, although such former will was the result of a contract between the testator and a third party governing the testamentary disposition of their property, but to sustain the contract if established by clear and convincing testimony and supported by an adequate consideration, and compelling its performance by the heirs of the decedent, or otherwise granting adequate relief. The court did not consider the facts upon which the surrogate based his decision, but because of his lack of jurisdiction, reversed his decree and reinstated the later will of 1914 (*Matter of Hermann,* 178 App. Div. 182; affd., without opinion, 222 N. Y. 564). The plaintiff thereupon brought this action, in which his complaint has been dismissed upon the merits.

Mary Hermann, the decedent, married one Christopher Goetz in 1873 and the defendants, respondents, Kate Ludwig and Christopher Goetz or Hermann, are the issue of that marriage. In 1878 Mrs. Goetz and her husband separated, and some time later she and the plaintiff began living together as husband and wife. She retained the custody of her two children, and in 1890 she married the plaintiff, George Hermann. At that date the decedent had a husband living from whom she had not been divorced, and the marriage was, therefore, void if the parties had knowledge of the existence

Second Department, February, 1919.          [Vol. 186.

of Goetz, but voidable only if they did not know he was living as he had absented himself for more than five years. (2 R. S. 139, §§ 5, 6; now Dom. Rel. Law [Consol. Laws, chap. 14; Laws of 1909, chap. 19], § 6, as amd. by Laws of 1915, chap. 266; Id. § 7.) The plaintiff testified that he did not know that Goetz was alive at the time he married the decedent. Goetz, who was called as a witness for defendants upon the trial, testified that after the separation he had one or two altercations with the plaintiff although no reason or explanation was given as to the cause, nor did Goetz claim that he ever made known his existence to his wife during the twenty-five years from the date of the separation down to her death in 1915. The plaintiff and deceased lived together apparently happily, they never had any children born to them, the two children of deceased remaining with them until they in turn married and established homes of their own. Plaintiff and deceased appear to have been hard-working, thrifty people. In 1891 a chop house was opened in Avenue B, Manhattan, plaintiff and decedent and her children conducting it and doing the work. The business prospered and the parties moved first to Tenth street and later to Fourteenth street. In 1904 the plaintiff and the deceased moved to College Point, L. I., where plaintiff had purchased land and erected a dwelling house, and between 1904 and 1908 the restaurant appears to have been conducted by the defendant, Mrs. Ludwig, the daughter of the decedent; plaintiff Hermann appears to have retained some interest in the business, visiting the restaurant from time to time. The relations existing between plaintiff, the deceased and her two children appear to have been friendly and affectionate during all these years and down to the death of Mrs. Hermann, so called, in 1915. When the son Christopher was a young man under twenty-one, he had some disagreements with plaintiff, and he served a term in the State Reformatory on his plea of guilty, for assaulting Hermann, but apparently friendly relations were restored in later years. The parties appear to have been hard-working, industrious and saving, accumulating considerable property from very small beginnings.

In 1895 the plaintiff and his wife, or reputed wife, executed a joint will in the following language:

" IN THE NAME OF GOD, AMEN:

" We, George Hermann and Mary Hermann, his wife, of the County and State of New York, being of sound mind and memory and mindful of the uncertainty of human life, do now make, publish and declare this and this only to be our joint and mutual will and testament, in the manner following, viz:

" *First.* We give unto the survivor of us all and any real and personal property either owned by us jointly or severally for his or her own use and benefit forever.

" *Second.* The survivor of us is hereby appointed Executor or Executrix (as the case may be).

" *Third.* Hereby revoking all other and former Wills by us at any time heretofore made, either jointly or severally, we again declare this our Last Will and Testament.

" *In Witness Whereof*, we have hereunto set our hands and seals in the City of New York, this thirtieth day of September, in the year One Thousand Eight Hundred and ninety-five.

" GEO. HERMANN        [L. S.]

" MARY HERMANN        [L. S.]

" Signed in the presence of:

" HUGO COHN

" JOHN HERMANN

" EDWARD BAHR.

" Signed, sealed, published and declared by the Testator and Testatrix George Hermann and Mary Hermann, his wife, as and for their Last Will and Testament (joint) in our presence, and we at their request, and in their presence and in the presence of each other, have hereunto subscribed our names as witnesses thereto, with our respective places of residence.

" HUGO COHN, 247 E. 116th St., N. Y. City.

" EDWARD BAHR, 1746 1 Ave.

" JOHN HERMANN, # 448 W. 57th Str., N. Y. City."

In July, 1895, just prior to making this joint will, the plaintiff purchased the premises 1746 First avenue in the borough of Manhattan. The consideration paid was $24,600, subject to a mortgage for $14,000, leaving an equity of $10,600. Evidence was introduced that, at the time, plaintiff withdrew

from the savings bank accounts in his name the sum of $9,000 with which to pay for the property. The defendants insist that the balance came from the individual bank account of Mary Hermann. The title to this property was taken in the name of "George Hermann and Mary, his wife." This was in July, 1895, and the joint will was executed in September of the same year. In December, 1901, the plaintiff purchased unimproved real estate at College Point, L. I., for $4,500, title being taken in the names of himself and Mary Hermann, as husband and wife. His savings bank accounts show withdrawals of some $3,900 at the date of this purchase, and a dwelling was erected by plaintiff on this property at a cost of $6,890, all of which was paid by plaintiff. This property became the home of plaintiff and deceased, occupied by them down to the date of her death in 1915. Again, after the execution of the joint will, in 1906, 1907, 1911 and 1913, four mortgages were made and assigned to plaintiff and Mary Hermann, aggregating $21,300, and the evidence indicates that in each case the money loaned or represented by these mortgages came from the plaintiff. In July, 1906, premises in Kosciusko street, Brooklyn, were purchased for the sum of $29,000, subject to mortgages for $21,800, leaving an equity of $7,200. Mrs. Kate Ludwig, the daughter of decedent, was interested in this purchase, apparently as one-half owner. The deed was made to Mary Hermann and Kate Ludwig. Plaintiff's individual bank account shows withdrawals at the time of $3,300, and the joint accounts of George and Mary Hermann show withdrawals of $2,400, all on the same day, July 2, 1906, the deed being dated July 3, 1906. Thereafter Mrs. Ludwig conveyed her one-half of the Kosciusko street property to her mother, in whose name the title stood down to her death. There were two other mortgages taken in the name of Mary Hermann, which plaintiff claims represent moneys coming from him. These two mortgages, aggregating $6,500, have been paid off, the proceeds remaining undistributed awaiting the result of this litigation. It was conceded at the trial that during all these years the plaintiff paid the taxes, water rates, insurance and the charges for the upkeep of the property. The couple having accumulated this substantial amount of real and personal property, appear to

have lived in entire harmony down to the death of Mrs. Hermann in May, 1915. The plaintiff supported his reputed wife, as well as her children by her former husband, practically from their infancy. It appears from the certificate issued at the time of their marriage in 1890, that the plaintiff was at that time twenty-eight years of age, while Mary Goetz or Hermann was thirty-six, eight years older than the plaintiff. At the death of Mary she was, therefore, sixty-one years old, while the plaintiff was fifty-three.

It appears that on July 10, 1914, Mary Hermann, then living with her reputed husband in College Point, secretly and without the knowledge of the plaintiff, went to the borough of Manhattan with her nephew, one Klein, and executed a new will. Her son Christopher met her at the lawyer's office but remained outside. The nephew testified that she asked him to say nothing to Hermann about the second will and that she repeated the request two or three times afterward. A niece of deceased testified that her aunt told her in July, 1914, that she was about to undergo an operation, that she had made a will the day before but that she did not want the plaintiff to know anything about it. On several occasions after her return from the hospital, she had interviews with her nephew Klein and her son Christopher at College Point concerning the new will, but these interviews were arranged to take place when plaintiff was absent from the house. The second will executed by Mary Hermann in 1914 is as follows:

" IN THE NAME OF GOD, AMEN:

" I, Mary Hermann, at present residing at the foot of 13th Street and North Boulevard, College Point, Long Island, New York, being of sound and disposing mind and memory, and realizing the uncertainty of life, do hereby make, publish and declare this to be my Last Will and Testament, as follows:

" *First.* I direct my Executor hereinafter named to pay all my just debts and funeral expenses out of my personal estate.

" *Second.* I give and bequeath unto my dear daughter Kate Ludwig, my parlor furniture and picture frames in parlor.

" *Third.* I give and bequeath to my dear granddaughter

Second Department, February, 1919.    [Vol. 186.

Helen Ludwig my diamond ring and my diamond pin and my piano.

"*Fourth.* I give unto my dear granddaughter Eleanor Hermann my watch and chain and my diamond earrings.

"*Fifth.* All the rest, residue and remainder of my estate, both real and personal, or to which I may be in any manner entitled to, is to be divided equally between my dear daughter Kate Ludwig and my dear son Christopher Goetz, otherwise known as Christopher Hermann.

"*Sixth.* The reason I do not make any bequest to my dear husband George Hermann is that he has ample means of his own and for no other reason.

"*Seventh.* I hereby nominate, constitute and appoint my dear nephew John F. Klein sole Executor of this my Last Will and Testament, with full power to sell any and all of my interest in real estate at public auction or private sale, whichever he may deem most advantageous to my estate.

"*Eight.* Hereby revoking all other and former Wills heretofore made by me, I again declare this and only this as my Last Will and Testament.

"*In Witness Whereof,* I have hereunto set my hand and seal at the Borough of Manhattan, City of New York, this 10th day of July, 1914.

"    MARY HERMANN    [SEAL]

" Witness:

"    HUGO COHN

"    JOHN F. KLEIN.

" Signed, Sealed, Published and Declared by the foregoing Testatrix, Mary Hermann, as and for her Last Will and Testament, in our presence and in the presence of each of us and we at her request and in her presence and in the presence of each other have hereunto subscribed our names as witnesses thereto.

" HUGO COHN, Kensington Gardens, Far Rockaway, Long Island, N. Y.

" JOHN F. KLEIN, 736 Eleventh Ave., Long Island City."

There is no suggestion in the evidence that the plaintiff knew of this will at the time it was made, or that Mrs. Hermann notified him of her intention to make it. There

is some evidence (introduced by defendants) that on her deathbed, within a week or two before her death, she told Hermann that she had made a will appointing her nephew Klein executor, and that Hermann's only objection or comment was that she should have made him or her son executor, but it is significant that this evidence comes from her son and his wife, and her daughter and the daughter's children. Hermann denies that he knew of the existence of the second will prior to the proceedings for its probate. Mr. Klein says that about two weeks prior to Mrs. Hermann's death the plaintiff asked him if he had drawn a will for decedent and he answered no. While this might indicate some suspicion on the part of plaintiff that a new will had been made, there is no evidence in the record that plaintiff knew of its execution at any time, except that of the children of decedent who are vitally interested, testifying to conversations immediately before her death; nor is there any intimation that at that time he was informed of its provisions, or consented to it. From the date of the joint will in 1895 down to the death of his wife, the plaintiff never executed another will. If plaintiff had died during that period of twenty years, Mary Hermann would have taken all of his property for " her own use and benefit forever," not only the particular real and personal property already referred to, but any other property belonging to him. Mary Hermann died on May 10, 1915, and it appears that the plaintiff at first waived a citation, but when the children discovered that their father Goetz was living, with the result that Hermann's right to inherit as survivor the property held jointly in the names of decedent and himself might be attacked, the waiver was returned to him, and a citation to attend the probate served upon him. It does not appear that he opposed the probate of the will in June, a month after his wife's decease, but in October of the same year he applied to the surrogate to set aside the probate, which application was granted, and the joint will of 1895 admitted to probate instead, resulting in the appeal and reversal of the surrogate's decision by this court which was subsequently affirmed by the Court of Appeals. It appears that the defendants, children of Mary Hermann and Goetz, dispute his right to take the property held jointly, as survivor,

Second Department, February, 1919.    [Vol. 186.

and have commenced an action in partition against him as well as requiring him to account for all property of deceased in his possession.

*John B. Stanchfield* [*Frank Morse Roosa* and *Sydney Rosenthal* with him on the brief], for the appellant.

*Henry A. Friedman* [*Charles L. Hoffman* with him on the brief], for the respondents Ludwig and McCarthy.

*Howard C. Taylor*, for the respondents Christopher Goetz, individually, etc., and another.

KELLY, J.:

The relief demanded in the complaint, that the original last will and testament of the plaintiff and Mary Hermann be established and proved as the last will and testament of said Mary Hermann, deceased, and that letters testamentary be issued to plaintiff as sole executor thereunder, is not in accordance with the views expressed by this court in reversing the decree of the Surrogate's Court admitting the joint will to probate. We then said, referring to the plaintiff's claim that the joint will was executed in pursuance of an agreement between the decedent and himself, " If such an agreement existed, that fact and its legal results could only be determined by the Supreme Court in an action in equity, and the manner of determination was not to admit a former will to probate, although such former will was the result of a contract between the testator and a third party governing the testamentary disposition of their property, but to sustain the contract, if established by clear and convincing testimony and supported by an adequate consideration and compelling its performance by the heirs of the decedent, or otherwise granting adequate relief." (*Matter of Hermann*, 178 App. Div. 182, 189; affd., without opinion, 222 N. Y. 564.) If the plaintiff is entitled to relief, it is not by establishing the joint will of 1895 as the last will of the decedent, because it was not her last will, but by compelling the performance of her obligations by her children and devisees under the will of 1914. As was said by the Court of Appeals in *Phalen v. United States Trust Co.* (186 N. Y.

178): " The principle upon which such agreements are sustained was stated by Lord CAMDEN as early as the year 1769, in *Dufour* v. *Perraro* [*Dufour* v. *Pereira*] (Hargrave's Jurid. Arg. 304), and it was not then new. That was a case of mutual wills, in which the learned jurist said (p. 309): ' Though a will is always revocable, and the last must always be the testator's will, yet a man may so bind his assets by agreement that his will shall be a trustee for performance of his agreement. A covenant to leave so much to his wife or daughter, etc.  *  *  *  These cases are common; and there is no difference between promising to make a will in such a form and making his will with a promise not to revoke it. This court does not set aside the will, but makes the devisee, heir or executor, trustee to perform the contract.  *  *  * No man shall deceive another to his prejudice. By engaging to do something that is in his power, he is made a trustee for the performance, and transmits that trust to those that claim under him. This court is never deceived by the form of instruments. The actions of men here are stripped of their legal clothing, and appear in their first naked simplicity. Good faith and conscience are the rules by which every transaction is judged in this court; and there is not an instance to be found since the jurisdiction was established where one man has ever been released from his engagement after the other has performed his part.' " And the court said in the case last cited that the principle was fully and firmly established that a man's representatives shall be trustees of a resulting trust for the benefit of those to whom he has bound his estate. It is upon this principle that plaintiff must rely to establish his right to relief — not to obtain a judgment that the will of 1895 was the last will of the decedent, but that the provisions of that will shall be decreed to be binding upon the estate of Mary Hermann and upon the defendants.

The judgment dismissing the plaintiff's complaint upon the merits is certainly most drastic in its results to the plaintiff. It not only deprives him of all interest in the estate and property of the woman who had lived with him for thirty-seven years as his wife, to whom he had been married publicly by a clergyman in 1890, twenty-five years before her death, but it adjudges that the real estate held in their joint names as

Second Department, February, 1919.    [Vol. 186.

husband and wife does not belong to him as survivor. The evidence shows that they had lived and labored together for all these years harmoniously and affectionately. When Mary Hermann's husband, Goetz, left her in 1878, five years after their marriage, never to return, she had two children, her son Christopher and her daughter Kate, the defendants and respondents here. As she was married to Goetz in 1873, the eldest of these children could not have reached the age of five years at the time of the separation. It was the plaintiff and Mary Hermann who brought them up to manhood and womanhood and who supported and maintained them until they married and went their way. It is true that they now attack the plaintiff and charge him with working them hard in their younger days and with failing to properly compensate them, but it must be remembered that in the effort to deprive the plaintiff of the property of the decedent to which he asserts he is entitled, they have not hesitated to blacken the character of their own mother. The plaintiff alleging in his complaint a lawful marriage to Mary Hermann, is met with the denial in their answers that the marriage was lawful, and an assertion that he knew when he married her that their father was living, and the learned trial judge has so found, although the record may be searched in vain for any evidence to justify such finding. They have discovered their father, who deserted them in their infancy, who never contributed a penny to their support or to the support of their mother, and who testified that he had been living with another woman as his wife for some twenty years, to testify that Hermann knew of his existence. But Goetz does not testify that the occasions on which he met Hermann were after the remarriage of his wife in 1890. And of course one of the peculiar results of the judgment appealed from might be that the recreant husband would be entitled to some interest in the real property of his wife, although he defaulted and the findings and judgment as made appear to make no provision for him. The court is not trying the morals of Hermann, the plaintiff, and any criticism on his relations with Mary Hermann must apply to her as well as to him. When she made the will of 1914, with the connivance of her son, without notice to Hermann and without his consent,

she called him her " dear husband " and expressly stated
that the reason she made no bequest to him was that he had
ample means of his own " and for no other reason." The
learned trial judge refused every request for findings of fact
presented by plaintiff save those as to the execution of the
two wills and the formal legal proceedings. The plaintiff is
certainly in evil case, because if he had predeceased Mary
Hermann his entire estate, not only that held in the joint
names of the parties and the other property purchased as he
says with his money but placed in his wife's name, but also
the " ample means of his own " referred to in her second
will, would have immediately passed to his wife in absolute
ownership by virtue of the joint will of 1895. He never
changed it, and during all these years he supported and
maintained her as he should, and preserved the estate, with
the assurance to her that it would all belong to her if he died
before her. The obvious result of the judgment appealed
from is such as to invite the scrutiny of a court of conscience
governed by principles of equity and fair dealing between
man and man.

We think this result should not be allowed to stand. There
are cases where joint wills have been executed providing for
a life estate in the survivor with remainder over, and where
the survivor having taken possession under the devise, has
attempted to make a new will disregarding the remaindermen,
and in these cases the courts have invariably held that the
will itself furnished the necessary evidence of an agreement
between the parties as to the disposition of their property
and have held the survivor to his life estate. Such were
*Rastetter* v. *Hoenninger* (151 App. Div. 853; reversed on other
grounds, 214 N. Y. 66); *Frazier* v. *Patterson* (243 Ill. 80; 90
N. E. Rep. 216); *Bower* v. *Daniel* (198 Mo. 289); 1 Redfield
on Wills, 182. And the courts have frequently enforced
agreements under which property was conveyed to a grantee
upon the promise that he would execute a will in favor of
the grantor (*Mutual Life Ins. Co.* v. *Holloday* [VAN VORST, J.],
13 Abb. N. C. 16; *Sherman* v. *Scott* [SMITH, P. J.], 27 Hun,
331), as well as other agreements based upon sufficient con-
sideration, by which the contracting party promised to devise
his estate in some particular manner. (*Adams* v. *Swift,* 169

App. Div. 802; *de Hierapolis* v. *Reilly*, 44 id. 22; affd., 168
N. Y. 585; *Kerker* v. *Levy*, 140 App. Div. 428; affd., 206 N. Y.
109; *Parsell* v. *Stryker*, 41 id. 480; *Freeman* v. *Freeman*, 43
id. 34; *Gall* v. *Gall*, 64 Hun, 600; *Winne* v. *Winne*, 166 N. Y.
263.)   In these cases the courts have uniformly sustained
the principle that if one of the contracting parties induces
the other so to act, that if the contract be abandoned he
cannot be restored to his former position, the contract must
be considered as perfected in equity, and a refusal to complete
is in the nature of a fraud.   (Willard Eq. [Potter's ed.] 284,
286; *Sherman* v. *Scott*, *supra*.)   A will made in pursuance of
such a contract is irrevocable, and a second will offered as a
revocation is ineffectual for that purpose.   (*Adams* v. *Swift*,
*supra*.)   As Judge VAN VORST said in *Mutual Life Ins. Co.*
v. *Holloday* (*supra*): " If the agreement was valid in law and
in equity, it would be a mockery of justice to say that having
executed the will, she fully satisfied her part of the agreement,
and was at liberty to revoke it the next day.   The right
secured by her husband was substantial, and could not be
defeated by another will."   But the respondents contend, and
the learned trial justice has sustained their contention, that in
the case at bar there is no evidence that the joint will of 1895
was made in pursuance of an agreement between the parties
that it should be irrevocable.   This is the difficulty referred to
by Mr. Justice SCOTT in the *Rastetter Case* (*supra*) as often
preventing the enforcement of mutual wills, and he says:
" It was this difficulty which defeated the plaintiff in *Lord Wal-
pole* case,\* and in *Edson* v. *Parsons*,† in neither of which cases
did the wills themselves contain any evidence of such an agree-
ment except such as might be found in the identity of the dispo-
sitions contained in the wills sought to be established as
mutual wills."   But the will of 1895 in the case at bar was not
a *mutual* will.   In such cases it may well be that the wills were
executed without either party knowing that the other had
executed his will, and there is no necessary inference that
the wills were the result of any mutual or reciprocal agree-
ment.   " But, where the parties execute their wills by the

---

\* *Lord Walpole* v. *Lord Orford* (3 Ves. Jr. 402).— [REP.
  † *Edson* v. *Parsons* (155 N. Y. 555).— [REP.

same instrument, it is not possible that such course could be adopted without some previous understanding or agreement between them. Each would necessarily know what disposition the other had made of his property. This inference is especially strong where the parties are husband and wife, and where they have a common interest in the welfare of the devisees. * * * If evidence of a mutual compact is necessary in such case, that evidence is afforded by what the parties did. We cannot see how the situation would be any different if witnesses had testified that they heard this husband and wife discuss what disposition they would make of their respective estates, and that they agreed with each other that they would make a joint will such as they did make. The fact that they made such will is satisfactory proof to our minds that it was done in accordance with their mutual compact to dispose of their property in this manner." (*Frazier* v. *Patterson, supra.*) And this doctrine is affirmed by this court in the First Department in *Rastetter* v. *Hoenninger* (*supra*) where Mr. Justice SCOTT, writing for the court, says: " When we come to consider a joint will, such as is presented in this case, *I am of opinion that the will itself furnishes the requisite proof,* not conclusive, perhaps, but sufficient to establish an agreement in the absence of any evidence tending to negative it. Judge GRAY,* speaking of *Dufour* v. *Pereira,* remarks: ' In that case, however, the will was in an instrument which was jointly executed by husband and wife and, while not a conclusive, it was a very material circumstance to be considered.' In *Lord Walpole* v. *Lord Orford,* Lord Chancellor LOUGHBOROUGH had occasion to refer to *Dufour* v. *Pereira,* in which he had been of counsel, and stated that the will, jointly executed by the husband and wife in that case, was considered by the court not as a will of the wife (who was the survivor), but as her contract with her husband for a valuable consideration, and that when she survived and had accepted its terms she bound herself to the conditions under which all the property was given by the husband's will. In my opinion that just rule should be applied to the present case. The will contained all; the necessary

* *Edson* v. *Parsons* (155 N. Y. 555).— [REP.

elements of a contract, including a valuable consideration. It
is true that the paper does not contain the word ' contract '
or ' agreement,' and that there is no express promise in it
that the survivor will carry out the scheme of disposition
to which both agreed. This, however, seems to me to be
immaterial if the fact of an agreement can be found in the
instrument itself. That the parties had agreed as to the
disposition of their property is evident from the will itself
and from the fact that they jointly executed it. The evidence
that the will was the result of an agreement is shown upon
the face of the paper, in this respect differentiating it from
mutual or identical wills which exhibit no intrinsic evidence
that they were made in consequence of an agreement between
the parties." This conclusion was affirmed by the Court
of Appeals (214 N. Y. 66), although the case was reversed
on other grounds. That court said (at p. 71), through
MILLER, J.: " It is also too well settled to require the citation
of authority that a person may make a valid agreement to
make a particular testamentary disposition of his property, but
see the opinion of GRAY, J., in *Edson* v. *Parsons* (155 N. Y.
555, p. 567), the case mainly relied upon by the appellants.
As a will an instrument is revocable at pleasure, but as a
contract, if supported by an adequate consideration, it is
enforceable in equity. There are no facts disclosed in this
case *aliunde* the will itself to establish a contract, and the
important question, therefore, is whether the instrument itself
imports a contract, as a majority of the Appellate Division
have held. We are not prepared to say that the mere fact
of a conjoint, reciprocal testamentary disposition by two per-
sons establishes a contract not to revoke, although that seems
to have been Lord CAMDEN's ruling in *Dufour* v. *Pereira*
(1 Dickens, 419; 2 Hargrave's Juridical Arguments, 277, 304),
a case often cited. Such wills are rare and, it may be, more
nearly import a contract than separate mutual wills such as
were involved in the leading case of *Lord Walpole* v. *Lord
Orford* (3 Ves. Jr. 402), and in *Edson* v. *Parsons* (*supra*). In
the case at bar the testators took the pains at the beginning
and again at the end of the will to declare ' this and this only
to be our last mutual and joint will and testament.' The
repetition of that phrase *in hæc verba* and especially of the

words ' and this only ' strongly tend to indicate an understanding that neither was to make a different testamentary disposition of his property in the future, for otherwise those significant words twice carefully used were meaningless. The language of the disposing clause imports the joint disposition of the collective property of both, not the independent disposition by each of his own. It is ' we,' not ' I, Franz, and I, Elizabetha,' give the income of ' our,' not of ' my,' real and personal property. They did not in express words give, devise and bequeath the remainder upon the death of the survivor, but they said ' after the death of the survivor of either of us, all our property both real and personal *shall be divided* in the manner following;' a phrase which again strongly suggests, if it does not alone import, a contract. The testators, husband and wife, provided first for the survivor and ultimately for their children, in whose welfare they were both mutually concerned. Although no one of the foregoing considerations standing alone might be sufficient to establish a contract, the cumulative effect of all when viewed together is so persuasive as unexplained to prove that the joint will was made pursuant to an agreement."

The significant language of the joint will in the *Rastetter* case, commented on by the Court of Appeals, is identical with the language of the joint will in the case at bar. Indeed, it was stated on the argument that the will in the case at bar was prepared by the same real estate agent or notary who drew the Rastetter will. Substantially the same language is used in making, as was said in the *Rastetter* case: " the joint disposition of the collective property of both, not the independent disposition by each of his own." (214 N. Y. 72.) In the case of *Bower* v. *Daniel* (198 Mo. 289), cited in Judge MILLER's opinion, the Supreme Court of Missouri said: " The court found that the mutual will was made between the husband and the wife in pursuance of a previous arrangement between them, and this we think is borne out by the will itself, and, there being no evidence to the contrary before us, that finding cannot be questioned." (See, also, *Williams* v. *Williams*, 96 S. E. Rep. [Va.] 749.) It is not essential to the intervention of equity in order to prevent the accomplishment of fraud, that an agreement should be established by

direct evidence. It may be established from such facts and circumstances as will raise an implication that it was made; and may have reinforcements from the evidence of the conduct of the parties at the time and subsequently. There was evidence in the case at bar from the brother of the *decedent* and from the brother and sister of the plaintiff, of express declaration by the decedent at the time of the execution of the joint will that it was drawn in pursuance of an agreement that it should be irrevocable, but the entire history of the parties, all the surrounding circumstances, and the various purchases of real estate and mortgages by the plaintiff with his own money, the title being taken in the name of his wife or in her name jointly with him, his continued maintenance and improvement of the property, the fact that during all the years he never made a new will, and the secret and clandestine method of the execution by the decedent of the new will in 1914, all these things point unmistakably to an agreement that the joint will was to be irrevocable and to last during the life of each of the parties and until the death of one or the other released the obligation. People in their circumstances do not make wills without deliberation, and it is impossible to conceive this man and woman journeying to the notary's office and executing this document with the idea that either one could change it without the consent of the other. Lord CAMDEN in *Dufour* v. *Pereira* (*supra*), cited by the Court of Appeals in *Phalen* v. *United States Trust Co.* (186 N. Y. 178), declares in reference to *mutual* wills (which must mean *joint* wills because the will under consideration was a *joint* will): " A mutual will is a mutual agreement * * *. The mutual will is in the whole and every part mutually upon condition, that the whole shall be the will.— There is a reciprocity, that runs throughout the instrument. The property of both is put into a common fund, and every devise is the joint devise of both. This is a contract. If not revoked during the joint lives by any open act, he that dies first dies with the promise of the survivor, that the joint will shall stand. It is too late afterwards for the survivor to change his mind; because the first dier's will is then irrevocable, which would otherwise have been differently framed, if that testator had been apprized of this dissent. Thus is the first

testator drawn in and seduced by the fraud of the other, to make a disposition in his favor, which but for such a false promise he would never have consented to." (2 Hargrave's Jurid. Arg., pp. 307, 308.) And it is further stated in the report of the case (p. 307) that counsel having " cited an authority to prove it, that where two had made a mutual will either of them might cheat his partner, *foeda machinatione*, by a secret will to disappoint the joint disposition, because they are two distinct instruments," Lord CAMDEN said: " The law of these countries then must be very defective, and totally destitute of the principles of equity and good conscience; for nothing can be more barbarous, than a law, which does permit in the very text of it one man to defraud another. The equity of this court abhors the principle * * *. [1 Dickens, 419, at p. 420.] It [the will] might have been revoked by both jointly; it might have been revoked separately, provided the party intending it, had given notice to the other of such revocation. But I cannot be of opinion, *that either of them, could, during their joint lives, do it secretly;* or that after the death of either, it could be done by the survivor by another will." Even if we assume that the vitally interested witnesses, whose testimony is of doubtful competency under section 829 of the Code, told the truth as to the deathbed statements of Mary Hermann, this was not the notice to which the plaintiff was entitled. What could he then do? Was he to engage in controversy with a woman on her deathbed who had lived with him on affectionate terms as his wife for thirty-seven years? Was he bound to leave her and hurry off to a lawyer to begin action against her in her last hours? The learned trial justice overruled the objection to the testimony of the son Christopher as incompetent under section 829 of the Code over defendants' exception, apparently upon the ground that as plaintiff was said to have been present, the objection was not available. This did not make this party to the action and vitally interested witness, competent to testify. (*Griswold* v. *Hart*, 205 N. Y. 384.) His sister and his wife and her fifteen-year-old child were allowed to testify in corroboration of his statement, the boy saying that Hermann, the plaintiff, asked her if she had made a will " and I could just hear her whisper

' Yes I did.' " This is not the kind of notice that equity and fair dealing require. Mary Hermann lived with the plaintiff for twenty years after the execution of the joint will, supported and maintained by him and with the assurance to her during all this time that in case of his death she would inherit all his property. It will not do to say that she received no benefit because he did not die, any more than it would be permitted to a policyholder who paid his premiums by note to say there was failure of consideration because he did not die or his property was not burned. (*Turnipseed* v. *Sirrine*, 57 S. C. 559; 35 S. E. Rep. 757.)

These considerations lead us to the conclusion that the finding of the learned trial justice that there was no evidence of an agreement or contract between the parties as a basis for the joint will of 1895 is contrary to the evidence and contrary to law, and the judgment is, therefore, reversed on this ground and judgment directed for the plaintiff in accordance with this opinion. This court reverses so much of the 5th finding of fact as declares that " at the time the plaintiff and Mary Hermann, deceased, went through the said marriage ceremony on May 11, 1890, the plaintiff knew  \*  \*  \*  that the said John C. Goetz then was still living and the husband of said Mary Hermann;" also the 6th, 7th, 8th and 9th findings of fact, as contrary to the evidence; also all of the conclusions of law. And this court finds the facts as requested by plaintiff (which findings were refused by the learned trial justice) numbered 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 24, 25, 26, 34, 35, 36, 38, 39, 40, 41. We also find the following conclusions of law as requested by the plaintiff and refused by the learned trial justice: Nos. 1, 2, 3, 4, 5, 6, 7, 8; and that plaintiff is entitled to a decree establishing the provisions of the joint will of 1895 as irrevocable and binding upon the defendants as heirs and devisees of Mary Hermann, deceased, under the will executed by her in 1914, and upon her estate; establishing the title of the plaintiff in fee simple absolute to the real property on First avenue, Manhattan, Kosciusko street, Brooklyn, and in College Point, L. I., and to the personal property of deceased; enjoining the defendants from asserting title to said real estate or interfering with the plaintiff's possession thereof as sole owner

in fee simple absolute, and to the personal property of said Mary Hermann, and enjoining and restraining the defendants Ludwig and Hermann from further proceeding with the partition suit instituted by them in this court in the county of New York. An order embodying these conclusions in proper form should be prepared and presented for signature upon notice.

The judgment dismissing complaint upon the merits should be reversed, and judgment directed for the plaintiff in accordance with opinion, with costs.

JENKS, P. J., MILLS, RICH and PUTNAM, JJ., concurred.

Judgment dismissing complaint upon the merits reversed, and judgment directed for plaintiff in accordance with opinion, with costs. Order to be settled on notice before Mr. Justice KELLY.